IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 JUN 28 AM 10: 05

| | | |
|---|---|---|
| DONALD REX MORRIS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **CASE NO. CV 99-B-2698-S** |
| | ) | |
| LIBERTY NATIONAL LIFE | ) | |
| INSURANCE CO., | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTERED**

JUN 2 8 2001

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by defendant Liberty National Life Insurance Company ("defendant" or "Liberty National"). Plaintiff Donald Rex Morris ("plaintiff" or "Morris") alleges that defendant violated the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, when it terminated his employment in July, 1998. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

### I. FACTUAL SUMMARY

The following facts were submitted by the parties and are not in dispute. Liberty National is an Alabama corporation engaged in the business of insurance sales. (DX 7 at ¶ 2.)[1]

---

[1] Defendant submitted Defendants' [*sic*] Evidentiary Submission in Support of its Motion for Summary Judgment with attached exhibits. References to this evidence will be cited as "DX" followed by the corresponding tab number. Plaintiff submitted Plaintiff's Evidentiary Submission in Opposition to Summary Judgment with attached exhibits. References to this evidence will be cited as "PX" followed by the corresponding tab number.

*57*

Morris[2] was employed by Liberty National as an insurance agent from 1973, until his termination for admittedly violating company underwriting rules on or about July 18, 1998.[3] (DX 1 at 61-62; DX 2 at Ex. 11; DX 2 at Ex. 1.) From August, 1982, until his termination, Morris was employed as an agent in Liberty National's Pell City district office. (DX 1 at 14.)

During the period preceding Morris's termination, Carl Blankenship ("Blankenship") was employed as Liberty National's Pell City District Manager. (DX 1 at 16; DX 3 at 12.) Blankenship was born on February 9, 1940. (DX 7 at ¶ 6.) As District Manager, Blankenship was responsible for supervising sales and enforcing company rules applicable to approximately twenty agents employed in the Pell City district, including Morris. (DX 3 at 7, 13.)

## A.   Agent's Responsibilities and Relevant Company Rules

An integral part of an agent's responsibilities at Liberty National is to solicit new business on behalf of the Company. (DX 7 at ¶ 3.) Agents solicit new business by contacting potential customers and describing the benefits of Liberty National's life insurance products. (DX 7 at ¶ 3.) If a customer decides to apply for life insurance, the agent assists the customer in completing the application and then submits the application to the appropriate Liberty National district office. (DX 7 at ¶ 4.) Liberty National's underwriting department then reviews the application. (DX 7 at ¶ 4.)

### 1.   Life Insurance Applications: The Signature Rules

---

[2] Morris was born on December 4, 1946. (Compl. at ¶ 3.)

[3] Morris's termination form is dated July 17, 1998, and the termination decision was communicated to him on July 20, 1998. (DX 1 at 73; DX 2 at Ex. 11.) To the extent there is any dispute regarding the termination date, it is immaterial for purposes of deciding Liberty National's motion for summary judgment.

Liberty National maintains specific written underwriting policies regarding an agent's permissible role in assisting a customer with a life insurance application.  (DX 7 at ¶ 5.)  These policies appear in Liberty National's Agent's Instruction Guide and Field Procedure Manual documents which are made available to its agents.  (DX 7 at ¶ 5.)

### (a)  Agent's Instruction Guide

The Agent's Instruction Guide states that "[t]he responsibility of obtaining and witnessing a signature is a serious one," and an "applicant must sign the completed application in the presence of the soliciting Agent, Sales Manager, or District Manager who must then sign his or her own name as witness."  (DX 2 at Ex. 13 at B-4 to B-5.)  The Agent's Instruction Guide further provides that, "[n]o person is permitted to sign the name of any other adult person as to any application or supplementary form under any circumstances."  (DX 2 at Ex. 13 at B-5.)  Morris acknowledges that he received a copy of the Agent's Instruction Guide while employed at Liberty National.  (DX 1 at 79.)

### (b)  Field Procedures Manual

Liberty National's prohibition against improper signature practices is also contained in its Field Procedures Manual, which states, in pertinent part:

310.   TERMINATIONS

    A.   The following are examples of conduct that will normally result in termination of employment:

       . . .

       5.   Violation of company underwriting guidelines, including, but not limited to, failure to observe signature rules, avoidance of commission rules, writing of fictitious business, and other unauthorized and inappropriate conduct with regard to policyholders.

3

(DX 2 at Ex. 12 at 300-4.)

On December 20, 1996, Liberty National Executive Vice President Vurl Duce[4] ("Duce") distributed to all district managers a memorandum regarding the application of the signature rules. (DX 2 at Ex. 8.) Duce's memorandum states, in pertinent part:

> (2)    The agent must **SEE** the Applicant sign the application for insurance.
>
> (3)    The applicant must **sign** their **OWN** name.
>
> (4)    The agent <u>must physically witness the applicant signing their own name</u> on the application.
>
> . . .
>
> There should be no reason why we would have to terminate anyone for violations of these rules.

(DX 2 at Ex. 8.)  Morris also acknowledges receiving and signing a copy of Duce's memorandum.  (DX 1 at 59-60.)

### (c)    Forgeries and "Failure to Witness" Signature Violations

There are two types of signature violations under Liberty National's rules:  (1) forgeries, where one person signs the name of another to an insurance application, and (2) an agent's failure to personally witness an applicant's signature to an insurance application, even if the signature is authentic.  (DX 5 at 15-16.)  Liberty National agents are expressly prohibited from attesting to forged signatures, and if an agent submits an application containing a forgery, company policy and practice uniformly dictates that there is no lesser punishment than termination.  (DX 2 at Ex. 13 at B-5; DX 5 at 12-13, 15.)  Liberty National district managers are authorized to terminate any agent who witnesses a forged insurance application.  (DX 5 at 12-

---

[4] Duce was fifty-five at the time of Morris's termination.  (DX 7 at ¶ 6.)

4

13.) Because witnessing a forged application constitutes an immediate terminable offense, district managers are not required to receive additional authorization from any other member of management before executing such a termination decision. (DX 5 at 13.)

Jack Kelley[5] ("Kelley") is employed as Liberty National's Senior Vice President of Marketing and Administration. (DX 5 at 6.) In this capacity, Kelley also serves as the company's Ethics Officer. (DX 5 at 7.) In his deposition, Kelley testified that in the case of a forgery, there is no lesser punishment than termination. (DX 5 at 15.) Kelley also testified that first-time "failure to personally witness" signature violations may result in a fine imposed on the violating agent. (DX 5 at 15.) An agent's subsequent similar offense would then result in termination.[6] (DX 5 at 15.)

### (d)  Rule Against Accepting Cash for Premiums

Liberty National's Field Procedures Manual also sets forth rules regarding specific circumstances in which an agent may collect cash from a customer for premium payment. (DX 8 at Ex. C at 100-1.) According to Kelley and Blankenship, an agent's violation of these rules has not always been considered a terminable offense. (DX 8 at ¶ 9.) The record reveals that, sometime in 1997, Liberty National amended its policy to make unauthorized collection of cash for insurance premiums an automatic termination offense. (DX 8 at ¶ 9.) According to Kelley, before that time, first time offenders were not terminated. (DX 8 at ¶ 9.)

---

[5] Kelley was fifty at the time of Morris's termination. (DX 7 at ¶ 6.)

[6] Kelley further testified that "[a]n agent's mailing an insurance application out of state in order to secure an applicant's signature can also constitute a violation of Liberty National's signature rules. In such a case, if the signature in question is authentic, then the violation is considered a "failure to witness" signature violation, not a forgery." (DX 8 at ¶ 6.)

5

### B.   Plaintiff's Employment in Pell City

Morris was fifty-one years old at the time of his termination. (Compl. at ¶¶ 3-5.)  At that time, Blankenship was fifty-eight years old, (DX 7 at ¶ 6), Duce was fifty-five years old, (DX 7 at ¶ 6); and Kelley was 50 years old, (DX 7 at ¶ 6).  It is undisputed that there were several employees older than Morris employed in the Pell City district.  Blankenship considered Morris a good agent and an "above average" business producer. (DX 3 at 13.)  Blankenship acknowledged that, before Morris's termination, he had no prior performance problems with him.  (DX 3 at 20-21.)

Morris admits that, in March, 1998, he was questioned regarding two separate potential "failure to witness" signature violations involving insurance applications for Scott Canterbury ("Canterberry") and another individual by the last name of Kelly.  (DX 1 at 50-56; DX 2 at Ex. 6.)  Though Morris was not disciplined, he received the following written directive from Kelley:

> I am at a loss to explain why these two young men would say that you were not
> present when you were there, but I will accept your statement that you were
> present to witness these signatures. But Don, we can't have any more of this.
> You need to do whatever you can to make sure that, in the future, applicants
> remember that you personally witnessed their signatures.

(DX 2 at Ex. 7.)

In his deposition, Morris admitted that he was not present to witness the signatures on the Canterberry and Kelly applications.  (DX 1 at 55.)  Morris also testified that he did not give the true facts to Kelley, the Liberty National official investigating these incidents, because he knew that if he had done so, he would have been terminated.  (DX 1 at 57-58.)[7]

---

[7] Whether Morris would have been terminated for failing to personally witness the signatures on the Canterberry and Kelly applications, as Morris testified, is immaterial to this case.  Kelley

6

## 1.     **Events Leading To Plaintiff's Termination**

In June, 1998, an insurance application submitted by Morris again raised questions regarding his violation of Liberty National's signature rules. (DX 2 at Ex. 9.) The record reveals that Morris submitted an application purportedly signed by Adam D. Deschamps and Bobbie J. Deschamps, husband and wife, to the Pell City District Office. (DX 2 at Ex. 9.) On June 24, 1998, Liberty National's underwriting department returned the Deschamps's application to Pell City with the following inquiry: "It appears that the same person signed [the application] for both clients." (DX 2 at Ex. 9.) Blankenship routed the application and inquiry to Morris for explanation. (DX 2 at Ex. 9.) Morris replied to Blankenship by writing the following notation on the underwriting inquiry and returning it to him: "Both insureds signed the application. I'm on vacation next week, so it will be the week after next when I get a new app[lication] signed. That's the best I can do." (DX 2 at Ex. 9.)

### (a)     **Plaintiff's Admission**

Morris returned from vacation and provided Blankenship with a second insurance application completed by the Deschamps. (DX 3 at 37-38.) At the time Morris delivered the second application to Blankenship, he explained the circumstances underlying the Deschamps's original application. (DX 3 at 39.) Morris told Blankenship that Mr. Deschamps was out of

---

testified that "failure to personally witness" signature violations, the type of violation Morris committed on the Canterberry and Kelly applications, could result in the imposition of a fine. (DX 5 at 15.)

7

town and had given Ms. Deschamps permission to sign his name on the first application in

Morris's presence.[8]  (DX 3 at 39.)

When Morris admitted he had witnessed and submitted an application containing a forged

signature, Blankenship told him that he "did not want to hear what actually happened."  (DX 3 at

39.)  According to Blankenship, he made this statement because he knew that Morris had

committed an automatic terminable offense.  (DX 3 at 44- 45.)  Morris testified that Blankenship

suggested he cancel the Deschamps's original application and replace it with a United Investors

policy.  (DX 1 at 63.)  Blankenship acknowledged that Morris and he discussed the possibility of

obtaining coverage through United Investors.  (DX 3 at 54.)  According to Blankenship, the

subject of United Investors came up only because that particular policy offered a superior rating

structure.  (DX 3 at 54-55.)  Blankenship denies that this conversation had anything to do with an

attempt to circumvent Morris's forgery violation.  (DX 3 at 55.)

### (b)   Plaintiff's Termination

It is undisputed that this was the first signature violation, forgery or otherwise, which

Blankenship had encountered as a Liberty National district manager.  (DX 3 at 45.)  Blankenship

testified that he knew that Morris's violation would result in termination.  (DX 3 at 44- 45.)

Blankenship nevertheless informed Morris that he would travel to Liberty National's

headquarters in Birmingham and meet with Duce to explain the situation and ask that Morris be

fined and allowed to remain with the company.  (DX 3 at 57- 58.)  Blankenship decided to

---

[8] The Deschamps application is distinguished from the applications of Canterberry and Kelly.
Morris committed two different signature violations.  Morris failed to personally witness the signing
of Canterberry and Kelly's applications.  Morris witnessed a forged signature on the Deschamps
application.

consult with Duce because Duce was "the only one who has any authority to make any decision on any other [discipline] besides what the guidelines call for is termination."  (DX 3 at 57.)

According to Blankenship, his meeting with Duce that afternoon was "short and sweet." (DX 3 at 57.)  Blankenship presented the facts and relayed Morris's statements regarding the Deschamps's original application to Duce.  (DX 3 at 57.)  Blankenship asked Duce if it would be possible, based on Morris's extended length of service, to impose a penalty less than termination. (DX 3 at 58.)  Duce informed Blankenship that Morris's violation called for automatic termination and confirmed that termination was the appropriate penalty in this case.  (DX 3 at 58.)  Blankenship then returned to the Pell City district office and completed the termination paperwork.  (DX 3 at 59.)

Kelley testified that Jim Poole ("Poole"), an in-house Liberty National attorney, consulted  him regarding the Morris matter on one occasion before the termination decision was finalized.  (DX 5 at 16.)  In conversation with Poole, Kelley confirmed that a forgery violation constituted an automatic termination offense.  (DX 5 at 16.)  Kelly testified in his deposition that he attributed the decision to terminate plaintiff to Blankenship.  (DX 5 at 16.)  There is no evidence which would suggest that either Poole or Kelley was otherwise involved in the decision to terminate Morris's employment.

On the following Monday, Blankenship met with Morris and Pell City District Sales Manager Gary Franklin ("Franklin").  (DX 1 at 64; DX 3 at 59.)  Blankenship informed Morris of the results of the meeting with Duce and that his employment with Liberty National had been terminated based on his admitted violation of Liberty National's rule against witnessing a forged signature on a life insurance application.  (DX 3 at 60-61.)

9

It is undisputed that Morris is the only agent who Blankenship has disciplined for violating Liberty National's signature rules. (DX 2 at 44-45.) Morris acknowledges that he does not know of any other agent in the Pell City district who committed a forgery offense while Blankenship was the District Manager. (DX 1 at 70-71.)

## C.      Plaintiff's Proffered Comparators

Morris contends that there are several younger agents, located in Pell City and other districts within the Liberty National organization, who committed similar offenses but received lesser penalties. During oral argument, Morris's counsel conceded that several of the comparators offered by him would not qualify as "similarly situated" under the standards established by the Eleventh Circuit.[9] Therefore, the court limits its discussion and analysis only to the comparators which plaintiff's counsel argued did qualify as "similarly situated" under a disparate treatment analysis.

### 1.      Bean, Bowman, and Hazelwood

Morris testified that he knew of three younger Pell City agents, Tommy Bean ("Bean"), Benny Bowman ("Bowman"), and Dewayne Hazelwood ("Hazelwood"), who in 1997, were allowed to pay a monetary fine instead of being terminated for collecting cash for insurance premiums. At that time, these agents were under the tenure of Pell City District Manager Bob Roach. (DX 1 at 16, 69.) Liberty National's records indicate that, in January, 1997, Bean was

---

[9] These individuals include: (1) Phillip Hare, a recently retired Pell City agent who told Morris that, approximately twenty years ago, he was not terminated for witnessing a forged application; (2) Dewayne Lasseter, a Hoover agent, and (3) Ronny Powell, a Florence agent. Morris testified that both Lasseter and Powell told him that they were not terminated for mailing an insurance application out of state in order to have it signed by the respective applicants.

forty-seven years old, Bowman was thirty-six years old, and Hazelwood was twenty-eight years old. (DX 7 at ¶ 7.)

Kelley testified that he was responsible for fining Bean, Bowman, and Hazelwood $250.00 each for their violation of the rule against accepting cash for premium payment. (DX 5 at 30-31.) Blankenship was not involved in the discipline decision to fine Bean, Bowman, and Hazelwood. (DX 3 at 62-64.) Blankenship did, however, in his capacity as the then Pell City District Sales Manager, communicate the decision to the three agents. (DX 3 at 62-63.) Blankenship testified that he believed the penalty for accepting cash was at that time "subject to" termination. (DX 3 at 65.)

## 2. Larry Zangas

Morris testified that Steve Sexton, ("Sexton"), a former Liberty National Regional Vice President, told him that in 1996 or 1997, Larry Zangas ("Zangas"), a Liberty National agent employed in the Brewton district, was not terminated for a signature violation. (DX 1 at 34-35.) Sexton's employment with Liberty National was terminated on December 31, 1998. (DX 8 at ¶ 7.) Morris admits that he does not know Zangas, nor Zangas's age.[10] (DX 1 at 36.) Morris could provide no additional information regarding the specific nature of Zangas's alleged signature violation. Morris surmised that Sexton knew about this incident because he was "in on those decisions at that time." (DX 1 at 36.)

Morris offers Sexton's sworn affidavit to support his allegation that Zangas "had a signature violation just like [Morris] did." (DX 1 at 130.) Sexton's affidavit states:

_____

[10] Liberty National's records indicate that Zangas was born on June 17, 1952. (DX 7 at ¶ 8.)

11

> During my employment with Liberty National, sometime around
> 1996, it was brought to my attention that Larry Zangas was in
> serious trouble for violating the company's signature rules,
> "Plugging" rules, or some other ethical rule, any of which are
> terminable offenses.

(PX 5 at ¶ 6.) Both Blankenship and Kelley testified that they have no knowledge of any alleged

signature violation involving Zangas. (DX 5 at 41; DX 3 at 70.)

Kelley further testified that he is aware of the following agents in the Liberty National

organization who were terminated for committing a forgery offense within the last three or four

years: Barbara Sims ("Sims"), Dan Ledbetter, Robin Ledbetter, and Joseph Guiliani ("Guiliani").

(DX 5 at 38-39.) According to Liberty National's records, Sims was forty-four years old at the

time of her termination; Dan Ledbetter was thirty-nine years old at the time of his termination;

Robin Ledbetter was thirty-seven years old at the time of her termination;  and Guiliani was

forty-four years old at the time of his termination.  (DX 8 at ¶ 8, Ex. B.)

### D.    Other Alleged Evidence of Age Discrimination

#### 1.    Alleged Blacklisting

Morris testified that several former Liberty National managers told him that there was a

"blacklist" at Liberty National and that "they looked at ways of firing older agents." (DX 1 at

24.) Morris also testified that, approximately six months before his termination, Blankenship

told him that he [Morris] had "better dot my I's and cross my T's because they were watching us

older agents; we were black listed." (DX 1 at 41.) Morris acknowledges that Blankenship's

alleged comment was made to him when he was under suspicion of committing earlier signature

violations. (DX 1 at 41- 42.) Though immaterial for purposes of summary judgment,

Blankenship denies ever making such a statement to Morris. (DX 3 at 67-69.)

12

### 2. Alleged Forced Retirement

Morris also contends that several older Liberty National agents were forced to retire. (DX 2 at Ex. 3.) According to Morris, these agents "just got tired of the constant hassle and being on probation [for low production] all the time" and were "tired of fighting the hassle of having to produce." (DX 1 at 89.)

### E. Plaintiff's Complaint

Morris's single-count Complaint alleges the following claim of disparate treatment age discrimination:

> The plaintiff was terminated allegedly for violating company policy. However, agents who were younger and who had less seniority than the plaintiff, were not terminated for committing substantially similar offenses. After the plaintiff was terminated, his duties were taken over by a younger and less senior employee.

(Compl. at ¶ 5.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

13

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A.      <u>Applicable Legal Framework</u>

In this case, plaintiff asserts a single claim, that defendant discriminated against him on the basis of age with regard to the termination of his employment in violation of the ADEA. (Compl. at ¶ 6.)  The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  A plaintiff may establish a prima facie case of age discrimination in three ways: (1) by presenting direct evidence of discriminatory intent; (2) by satisfying the circumstantial evidence elements set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) as modified;[11] or (3) by statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.

---

[11] *McDonnell Douglas* involved racial discrimination, but its holding subsequently has been adapted to other forms of employment discrimination, such as age discrimination. *See Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

1989).  In this case, plaintiff seeks to establish a prima facie case of age discrimination using both alleged direct evidence and circumstantial disparate treatment evidence.

### 1.    Direct Evidence Standard

Direct evidence is "'evidence, which if believed, proves existence of fact in issue without inference of presumption.'" *Merrit v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)).  The Eleventh Circuit acknowledges that this is a rigorous standard. *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1359 (11th Cir. 1999).  Direct evidence "must indicate that the complained of employment decision was *motivated* by the decision-maker's ageism." *Id.*  Thus, "'only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age' will constitute direct evidence of discrimination." *Id.* (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)).  For example, "direct evidence would be a management memorandum saying, 'Fire Earley - - he is too old.'" *Earley*, 907 F.2d at 1082.

Evidence that merely "suggests discrimination . . . or that is subject to more than one interpretation . . . does not constitute direct evidence." *Merrit*, 120 F.3d at 1189 (internal citations omitted).  Stray remarks, statements by non-decisionmakers, and statements by decisionmakers unrelated to the decisional process itself, do not constitute direct evidence of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924, (11th Cir. 1990) (quoting *Price Waterhouse*, 490 U.S. 228, 277 (1989)); *Mauter v. Hardy, Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987) (statements by non-decisionmaker).

### 2.    Circumstantial Evidence: Disparate Treatment

15

An ADEA plaintiff may also establish a prima facie case of discrimination by demonstrating that similarly situated younger employees who violated a work rule were treated differently. The Eleventh Circuit has articulated the following elements required to establish a prima facie case in a individual disparate treatment, comparative evidence model of proof: first plaintiff must establish that he is a member of a protected class and "(a) that [plaintiff] did not violate the work rule or (b) that [plaintiff] engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *See Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989).

### 3. <u>Burden-Shifting Analysis</u>

If a plaintiff presents direct evidence of the employer's discriminatory motive, then the employer must prove, by a preponderance of the evidence, that it would have made the same decision even if it had not used unlawful criteria. *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1554-55 (11th Cir. 1990). Where ADEA discrimination claims are based on circumstantial evidence, the Eleventh Circuit applies the familiar tripartite analysis established in *McDonnell Douglas* and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). If a plaintiff establishes a prima facie case based on circumstantial evidence, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Chapman*, 229 F.3d at 1024. However, the employer's burden is merely one of production; it "'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's

16

evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"

*Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 254-55) (citations and footnote omitted).

If the employer articulates one or more such legitimate, nondiscriminatory reasons, the

presumption of discrimination vanishes and "'the plaintiff has the opportunity to come forward

with evidence, including the previously produced evidence establishing the prima facie case,

sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer

were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024-

25. An ADEA plaintiff claiming disparate treatment "bears the ultimate burden of proving that

age was a determining factor in the employer's decision to fire him or her." *Carter  v. City of

Miami*, 870 F.2d 578, 581 (11th Cir.1989).  If the plaintiff fails to produce sufficient evidence to

create a genuine issue of material fact regarding whether each of the defendant employer's

articulated reasons is pretextual, the employer is entitled to summary judgment. *See id.* at 585.

**B.**     **Plaintiff Failed to Establish a Prima Facie Case of Age Discrimination**

For the reasons which follow, the court concludes that Morris has failed to establish a

prima facie case of age discrimination using either alleged direct evidence or alleged

circumstantial disparate treatment evidence.

**1.**     **No Direct Evidence**

Morris contends that Blankenship's alleged statement that he had "better dot my I's and

cross my T's because they were watching us older agents; we were blacklisted," his further

testimony that senior management made statements that the company was looking for ways to

fire older agents and that Andy King ("King"), the Senior Vice President, had been hired to fire

17

the older agents constitutes direct evidence of age discrimination. (Pl.'s Brief at 14; DX 1 at 24, 30-32, 41.)

Assuming that Blankenship did in fact make the "blacklisting" statement, this evidence does not rise to the level of direct evidence under the standard applied in the Eleventh Circuit. Blankenship's statement is subject to non-discriminatory interpretation, particularly in light of the fact that Morris and Blankenship were discussing signature rule violations by Morris at the time the statement was made to him. (DX 1 at 41-42.)  Blankenship's statement to Morris does not prove that age motivated Liberty National to terminate Morris's employment. *See, e.g., Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1303-94 (11th Cir. 1997) (evidence which suggests, but does not prove, a discriminatory motive, is circumstantial evidence by definition).  The court also notes that Blankenship is more than six years older than Morris.  This creates a strong presumption against discriminatory intent. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("[Plaintiff] faces a difficult burden here, because all the primary players behind his termination . . . were well over the age of forty and within the class of persons protected by the ADEA").  The circumstances surrounding the alleged remark further negate any direct evidence of discrimination regarding Morris's termination. Therefore, Morris has failed to establish a prima facie case by presenting direct evidence of age discrimination.

Morris's testimony that several former Liberty National managers told him that older agents were "blacklisted," that the company was "looking for ways to fire older agents," and that King was hired "for one reason and that was to fire the older agents," constitutes inadmissible hearsay, and Morris has failed to offer any evidence which would indicate that such statements

18

could be reduced to an admissible form at trial. *See Pritchard v. The Southern Co. Servs.*, 92

F.3d 1130, 1135 (11th Cir. 1996) (Plaintiff could not use inadmissible hearsay to defeat

defendant's Motion for Summary Judgment when hearsay would not be reduced to admissible

form at trial.) Thus, because the statements offered by plaintiff are inadmissible hearsay, they

cannot be considered on a motion for summary judgment. *Macuba v. Deboer,* 193 F.3d 1316,

1322 (11th Cir. 1999).

The court now turns to the issue of whether Morris has stated a prima facie case through

circumstantial evidence of disparate treatment. For the reasons which follow, the court

concludes Morris has failed to do so.

### 2.   No Circumstantial Evidence

#### a.  Comparators Are Not Similarly Situated

Morris contends that similarly situated younger agents were not disciplined as harshly as

he was for committing substantially similar offenses. "In determining whether employees are

similarly situated for purposes of establishing a prima facie case [of disparate treatment], 'it is

necessary to consider whether the employees are involved in or accused of the same or similar

conduct and are disciplined in different ways.'" *Jones*, 137 F.3d at 1311 (quoting *Holifield v.

Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). The alleged comparator must be "similarly

situated in all relevant respects." *Holifield*, 115 F.3d at 1562. The Eleventh Circuit has

explained that "the quantity and quality of the comparator's misconduct [must] be nearly

identical to prevent courts from second-guessing employers' reasonable decisions and confusing

apples with oranges." *Maniccia*, 171 F.3d at 1368; *Pennington v. City of Huntsville*, 93 F. Supp.

2d 1201, 1216 (N.D. Ala. 2000) ("An employer who makes a distinction between employees

19

because that employer believes the employees are not similarly situated does not discriminate on an impermissible basis.") (citations omitted).

In evaluating a proffered comparator's act of misconduct, "[t]he most important factors . . . 'are the nature of the offenses committed and the nature of the punishments imposed.'" *Jones*, 137 F.3d at 1311 (internal quotations and citations omitted). The Eleventh Circuit has also recognized that, in general, the plaintiff must also demonstrate that he dealt with the same decision-making supervisor regarding the challenged decision. *See Jones*, 137 F.3d at 1312 n. 7; *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).

No reasonable jury could conclude that Morris's proffered comparators are similarly situated to him.

### (i)     **Bean, Bowman, and Hazelwood**

#### (a)     **Different Misconduct**

Bean, Bowman, and Hazelwood are not proper comparators to Morris because they engaged in distinguishable misconduct. These agents were accused of violating Liberty National's rule prohibiting agents from accepting cash for insurance premiums, a rule entirely different from the forgery offense for which plaintiff was terminated. (DX 5 at 30-31.) Morris himself acknowledges that the rule these alleged comparators violated is not the same rule for which he was terminated. (DX 1 at 69.) Kelley testified that the "no cash for premiums" rule has been in existence for approximately three years, and that it was not always considered a terminable offense by Liberty National. (DX 5 at 29-30.) The rule against forgery, on the other hand, has always carried an automatic termination penalty. (DX 5 at 29.)

20

Federal employment statutes such as the ADEA do not "'take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.'" *Jones*, 137 F.3d at 1311 (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984)). Here, the three alleged comparators violated an unrelated rule which carried with it a different penalty. The court recognizes that Liberty National has the authority to promulgate its own rules and assign its own penalties to different rule violations. It is well-settled that different types of misconduct cannot be compared for purposes of disparate treatment. *See Jones*, 137 F.3d at 1312-13; *Maniccia*, 171 F.3d at 1369.

In *Jones v. Bessemer Carraway Medical Center*, the Eleventh Circuit examined a disciplinary rule prohibiting nurses from committing medication errors in patient treatment. 137 F.3d at 1312. Both this rule and the employer's rule prohibiting insubordination were offenses which "could" result in termination under the employer's workplace policies. 137 F.3d at 1312. The *Jones* court held that the employer's "medication errors" rule was, however, different in nature from insubordination and could not be considered proper comparative evidence. *Id.* According to the *Jones* court, "it is insufficient to characterize conduct as 'similar' for [disparate treatment] analysis simply because it may result in the same or similar punishment. . . . one of the most important factors in determining similarity is the 'nature of the offenses committed.'" 137 F.3d at 1312 (quoting *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989)).

The record reveals that Liberty National has consistently maintained a "zero tolerance" policy toward forgery cases. The rule against collecting cash for premiums, on the other hand, was not always considered an immediately terminable offense by the company. (DX 5 at 29-30.) The clear difference in the nature of the offense committed by Bean, Bowman, and Hazelwood

and the offense committed by Morris, makes this insufficient comparator evidence for purposes of unlawful disparate treatment.

### (b)   Different Decision Maker

Though Bean, Bowman, and Hazelwood fall under the same geographic district as Morris did, there is no evidence that Blankenship was a decision maker in the alleged preferential treatment afforded Bean, Bowman, and Hazelwood. The Eleventh Circuit has recognized that disciplinary measures taken by different supervisors may not be comparable for purposes of a disparate treatment analysis. *See Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989) ("Although a change in managers is not a defense to . . . discrimination, it can suggest a basis other than [a protected classification] for the difference in treatment received by two employees.") (citing *Cooper v. City of North Olmstead*, 795 F.2d 1265, 1271 (6th Cir. 1986)); *Lynch v. Dean*, 39 FEP Cases [BNA] 338, 345 (M.D. Tenn. 1985), *revs'd on other grounds*, 817 F.2d 380 (6th Cir. 1987) ("Proof that workers under [one foreman's] supervision were disciplined more severely than workers under the supervision of other foremen does not aid plaintiff in insisting that she was the victim of selective enforcement of the rules.")). Here, Kelley testified that he made the decision to fine Bean, Bowman, and Hazelwood. (DX 5 at 32.) Blankenship, in his capacity as District Sales Manager, communicated the disciplinary decision to them. (DX 3 at 62-65.) Morris's failure to connect Blankenship as a decision maker further negates his ability to offer Bean, Bowman, and Hazelwood as proper comparators regarding his forgery offense.

22

(ii)     **Larry Zangas**

Zangas, an agent in the Brewton district, is the other comparator offered by Morris to support his disparate treatment claim. (Pl.'s Brief at 7.)  Morris testified that Sexton told him that Zangas was not terminated for a signature violation which occurred either in 1996 or 1997. (DX 1 at 34-35.)  Sexton did not tell Morris how he knew this information, nor could Morris provide any additional information regarding Zangas's alleged signature violation. (DX 1 at 35-36.)  Sexton's supporting affidavit provides little specific information regarding the circumstances of Zangas's alleged offense.  The affidavit simply states:

> During my employment with Liberty National, sometime around 1996, it was brought to my attention that Larry Zangas was in serious trouble for violating the company's signature rules, the "Plugging" rules, or some other ethical rule, any of which are terminable offenses.  Liberty National's Executive Vice President, Hillary Carnley informed me that he knew that I knew about Larry Zangas's situation and told me that, "Don't worry about it, the problem has been taken care of.  Larry Zangas was not going to be terminated, and that this matter was never to be discussed again."[12]

(PX 5 at ¶ 6.)

(a)     **Inadmissible Hearsay**

Inadmissible hearsay cannot be considered on a motion for summary judgment.  *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).  Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence." FED. R. CIV. P. 56(e).  This rule also applies to deposition testimony.  *Macuba,* 193

---

[12] The Affidavit of Steve Sexton incorrectly spells Zangas as "Zangus."

23

F.3d at 1323.  Morris's testimony to prove the truth of the matter Sexton asserted to him, i.e., that Zangas committed an identical signature violation, is hearsay and cannot be considered as summary judgment opposition evidence.

Morris offers no evidence, absent his own speculation that Sexton was "in on those decisions at that time," (DX 1 at 36), to support his assertion that Sexton had personal knowledge of Zangas's alleged violation.  Further, it is clear that Sexton's statement to Morris was made long after his employment as Regional Vice President ended with Liberty National.[13]  Therefore, Sexton's testimony cannot be accepted as a non-hearsay admission under Fed. R. Evid. 801(d)(2)(D).  *See Harris v. Delchamps*, 5 F. Supp. 2d 1316, 1325 (M.D. Ala. 1998) (inadmissible hearsay could be admissible if made by individual acting as defendant's agent at time statement was made).

### (b)     Undefined Misconduct

Sexton's affidavit fails to identify any specific rule which Zangas allegedly violated.  (PX 5 at ¶ 6.)  A reasonable interpretation of Sexton's statement demonstrates that he has no personal knowledge of any specific misconduct committed by Zangas.  Thus, this is inadmissible comparator evidence for purposes of summary judgment.  *See, e.g., Gaines v. Suttles Truck Leasing, Inc.*, No. 98-0269-BH-M, 1999 U.S. Dist. LEXIS 11649, *1-2 (S.D. Ala.) (discussing inadmissible nature of evidence which fails for lack of personal knowledge).

---

[13] Sexton gave his statement on November 28, 2000.  (PX 5 at 2.)  Sexton's employment with Liberty National was terminated on December 31, 1998.  (DX 8 at ¶ 7.)

(c)     **Different Decision Maker**

It is also undisputed that Zangas did not work in the Pell City district, nor was he at any time supervised by Blankenship.[14]  Thus, Morris's allegation does not constitute sufficient comparator evidence.  *See Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir. 1989).

Absent evidence that similarly situated younger agents were treated more favorable for nearly identical misconduct, Morris's prima facie case of disparate treatment age discrimination fails.

C.     **No Evidence of Pretext**

However, assuming that Morris stated a prima facie case, his claim cannot survive the burden shifting analysis required in ADEA cases.  *See Chapman,* 229 F.3d at 1024-25.  It is undisputed that Liberty National has advanced a legitimate, nondiscriminatory reason for Morris's termination  - - his admitted submission of a life insurance application which contained a forged signature.  The burden now returns to Morris to establish sufficient evidence which would permit a reasonable fact finder to conclude that Liberty National's reason for terminating Morris was false and that the real reason was age discrimination.  *See Carter v. City of Miami,* 870 F.2d 578, 584-85 (11th Cir. 1989).

1.     **No Similarly Situated Comparators**

Whether Morris's proffered comparators are considered as part of his prima facie case or as rebuttal evidence to demonstrate pretext, the inadmissible nature of some of the testimony, the differences in the types of misconduct at issue, the dates of occurrence of the misconduct, and the

---

[14] At the time of the incident Sexton is referencing, he was the Manager of the Brewton District.  (PX 5 at ¶ 5.)

different decision makers involved in each case demonstrate that the agents offered by Morris are not similarly situated under a disparate treatment analysis. Therefore, this comparator evidence cannot establish a reasonable inference of pretext in this case.

### 2.     "Blacklisting" Comments

Morris's testimony that several former managers told him that there was a "blacklist" at Liberty National and that "they looked at ways of firing older agents," (DX 1 at 24), is inadmissible double hearsay and cannot be considered as circumstantial opposition evidence. *See Zaben v. Air Products & Chemicals*, 129 F.3d 1453, 1456-57 (11th Cir. 1997) (citing *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996, 1002 (3rd Cir. 1988)).[15]

However, even ignoring the inadmissible nature of this testimony, this alleged circumstantial evidence does not create a reasonable inference of pretext of age discrimination. It is undisputed that not one of these former managers was involved in Morris's termination. These alleged remarks do not reveal a discriminatory animus on the part of Blankenship, the challenged decision maker, or the relevant decision making process that related to Morris's termination. *See Mauter v. The Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987) (statement by Vice President who did not make decision to terminate plaintiff did not present genuine issue of material fact as to company's discriminatory intent). Thus, these alleged statements, even if considered, are far too attenuated to create a reasonable inference of pretext in this case.

---

[15] In *Carden*, the Third Circuit held that the plaintiff's testimony that his supervisors told him that "they [presumably meaning unidentified superiors of the supervisor at the company] wanted a younger person" was double hearsay because there was no basis for admitting the statement that "they" made.  850. F2d at 1002.

26

### 3.    **Blankenship's Remarks**

As stated above, the court concludes that Morris's testimony that Blankenship told him

he had "better dot my I's and cross my T's because they were watching us older agents; we were

black listed," does not constitute direct evidence of age discrimination.  (DX 1 at 41.)  However,

even considered as circumstantial rebuttal evidence, the court concludes that Blankenship's

alleged remarks regarding scrutiny and blacklisting do not create a triable issue of unlawful

motivation in this case.

### 4.    **Forced Retirement**

Morris also testified that several Liberty National agents told him that they were "forced"

to retire because they "just got tired of the constant hassle and being on probation [for low

production] all the time" and were "tired of fighting the hassle of having to produce."  (DX 1 at

89, 92.)  This testimony is inadmissible hearsay and far too speculative and conclusory to

establish any reasonable inference of pretext regarding Morris's termination.  *Slaughter v.*

*Allstate Ins. Co.*, 803 F.2d 857, 860-61 (5th Cir. 1986) (mere belief that a policy of

discrimination existed, without personal knowledge, is insufficient to establish pretext).

### 5.    **Other Forgery Terminations**

Kelley testified regarding four other agents of whom he is aware who were terminated for

the same forgery offense as was Morris within the last three to four years.  (DX 8 at ¶ 8.)  Of

these four agents, two were under forty years old (Dan Ledbetter (thirty-nine) and Robin

Ledbetter (thirty-seven)) and two were over forty years old (Barbara Sims (forty-four) and

Joseph Guiliani (forty-four)) at the time of their respective terminations.  (DX 8 at ¶ 8.)  Even the

two agents who fall within an age-protected category are substantially younger than Morris.  The

27

consistent enforcement of Liberty National's rule against forgery, applied to agents both age-protected and not, undermines Morris's argument and negates any reasonable inference of pretext regarding his termination. *See Harris v. Plastics Manufacturing Co.*, 617 F.2d 438, 440 (5th Cir. 1980) (motion to dismiss properly granted where employer presented evidence both minority and non-minority employees were disciplined in the same manner for similar offenses).

## IV. CONCLUSION

Morris's ADEA claim fails to survive Liberty National's motion for summary judgment because Morris has failed to present either direct evidence or circumstantial evidence that younger employees were treated differently after committing substantially similar misconduct. Additionally, the probative value of alleged discriminatory remarks which Morris attributes to Blankenship and other Liberty National managers is too weak to create a reasonable inference that Liberty National's decision to terminate his employment was pretextual. For the foregoing reasons, the court concludes that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 28th day of June, 2001.

**SHARON LOVELACE BLACKBURN**
United States District Judge

28